## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**MS. Q.**, an individual,
9998 U.S. 83
Laredo, TX  78046;

**J.**, a minor,
c/o National Immigrant Justice Center
208 S. LaSalle St., Ste. 1300
Chicago, IL  60604,

        Plaintiffs,

    v.

**U.S. IMMIGRATION AND CUSTOMS
ENFORCEMENT**,
500 12th Street SW
Washington, DC  20536;

**RONALD D. VITIELLO**, in his official
capacity, Acting Director and Deputy Director,
U.S. Immigration and Customs Enforcement,
500 12th Street SW
Washington, DC  20536;

**U.S. DEPARTMENT OF HOMELAND
SECURITY**,
245 Murray Lane SW
Washington, DC  20528;

**KIRSTJEN NIELSEN**, in her official
capacity, Secretary, U.S. Department of
Homeland Security,
25 Murray Lane SW
Washington, DC  20528;

**JEFFERSON B. SESSIONS III**, in his
official capacity, Attorney General of the
United States, U.S. Department of Justice,
950 Pennsylvania Avenue NW
Washington, DC  20530,

        Defendants.

Civil Action No. _____

**COMPLAINT FOR INJUNCTIVE AND
DECLARATORY RELIEF**

Plaintiffs Ms. Q. and J., through their counsel Gibson, Dunn & Crutcher LLP, the National Immigrant Justice Center, and the Center for Constitutional Rights, respectfully submit this complaint for declaratory and injunctive relief to bring an end to Defendants' unlawful forced separation of their family unit, and to secure reunification of mother and child.[1]

## INTRODUCTION

1.      Plaintiffs Ms. Q. and her four-year-old son, J., are asylum seekers from El Salvador who Defendants forcibly separated from each other for seven months since they entered the United States on March 22, 2018.  Ms. Q. and J. travelled to the United States in fear for their lives, fleeing the gang violence and persecution they faced in El Salvador and with the intention to seek asylum and safety in this country.  At the border, U.S. Customs and Border Protection (CBP) apprehended Ms. Q. and J. and brought them to a CBP processing station, where they were held overnight in a crowded cell without access to adequate clothing, bedding, and sanitary supplies.  The next day, Defendants placed Ms. Q. and J. in a wire cage.

2.      A few days later, on March 25, 2018, Defendants forcibly separated Ms. Q. from J.—who was just three years old at the time—pursuant to what the Trump Administration would later refer to as its "Zero Tolerance" and family separation policy by which the Administration seeks to impose severe stress on families, including small children, in the hope of deterring future refugees from seeking asylum.  When they separated Ms. Q. from her son, Defendants did not make any determination that Ms. Q. was unfit or that she presented a danger to her child.  Nor did Defendants give Ms. Q. prior notice of the separation or any opportunity to otherwise contest their decision to take her toddler away from her.

3.      Even though President Trump subsequently withdrew the Administration's "Zero Tolerance" and family separation policy (explaining that "the policy of this Administration [is] to maintain family unity, including by detaining alien families together"[2]), Defendants still have not reunited Ms. Q. and J.  To the contrary, Defendants are continuing to hold Ms. Q. in a detention

---

[1]  To protect Plaintiffs' privacy and personal safety, only their initials are used in this public complaint.  Plaintiffs have concurrently filed a motion to proceed using a pseudonym.

[2]  Exec. Order No. 13,841, 83 Fed. Reg. 29,435 (June 20, 2018).

center in Laredo, Texas, while keeping J. in a shelter for unaccompanied immigrant children 1,400 miles away in Chicago, Illinois.

4.      Defendants' only purported basis for the continued, seven-month separation of this mother and child is a vague, untested warrant issued in El Salvador that alleges Ms. Q. is a gang member.  Ms. Q. is not a gang member and has never been convicted of a crime.  The Salvadoran warrant was issued after a broad dragnet operation arrested several suspects and then later summoned more than 30 additional people—including Ms. Q.—to appear before the court.  Ms. Q. was already being detained in the United States when the preliminary hearing was held in her case, so she was never given the opportunity to meaningfully challenge the charge, nor was she aware of any charges pending against her in El Salvador until she was separated from her son in the United States.  Ms. Q. has subsequently retained Salvadoran counsel, who awaits a hearing where he can argue that the prosecutor has failed to present sufficient evidence and that the charge against Ms. Q. should be dropped.  Charges have already been dropped against all six individuals caught up in the same indiscriminate dragnet operation that appeared at the preliminary hearing with counsel; charges are now only pending against others like Ms. Q. that did not appear.

5.      For its part, the Government has failed to supply any substantiating evidence in support of the warrant or the underlying charge.  To the contrary, an immigration judge has reviewed this warrant and was "not convinced that there is sufficient evidence to find [Ms. Q.] a danger to the community," and confirmed that she did not "have any other criminal history in El Salvador or the United States."  Furthermore, at Ms. Q.'s asylum hearing, the Government did not argue and the immigration judge did not find that any statutory bars to asylum—including for criminal behavior—applied to Ms. Q.; nor did the immigration judge find that Ms. Q. is in a gang or that she has engaged in criminal behavior of any kind.  Defendants have not put forth any other evidence to justify keeping Ms. Q. separated from J.

6.      Despite their lack of justification, by initiating and continuing the forced separation of mother and son, Defendants are knowingly causing Plaintiffs to endure wrenching trauma that will have permanent effects on both; each already manifests signs of severe trauma.  As a child at

a critical stage in his physical, cognitive, and emotional development, J. is suffering severe developmental setbacks as a result of being separated from his mother, the only caretaker and source of stability that he has ever known.  In the seven months since Defendants separated their family, J. experienced his fourth birthday alone, in detention.  Ms. Q. has spoken on the phone with J. around ten times (most of which Ms. Q. had to arrange on her own, at her own expense).  In recent phone calls, J. has been confused and has not recognized his own mother's voice.

7.      J.'s condition rapidly deteriorates, both physically and emotionally, each day he remains separated from his mother.  He was toilet trained when he arrived in the United States with his mother, but he has now reverted to requiring diapers after several bathroom-related accidents.  He is also suffering from developmental delays, including major speech difficulties and constant crying.  J.'s regressions are consistent with elementary social and psychological development principles that define the basic human experience:  children need the presence and love of a parent.  As one district court put it, "separating children from parents is a highly destabilizing, traumatic experience that has long term consequences on child well-being, safety, and development."  *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1147 (S.D. Cal. 2018).  And just one week ago, another federal judge stated that the separation of a child from his father was "the most cruel of all cruelties."[3]  A federally-appointed child advocate from the University of Chicago's Young Center for Immigrant Children's Rights has recommended that it is in J.'s best interest to be reunified with his mother.

8.      The effects on Ms. Q. of being separated from her child are severe as well.  She has had significant sleep disturbances since the separation and recently started having halting anxiety attacks.  Ms. Q. is consumed with thoughts and sadness about her son; her body aches from crying so much.  In early September 2018, Ms. Q. got sick in a way that she had never experienced before.  Her blood pressure rose, her lips became swollen, and she began trembling.  Since then, Ms. Q. has continued to experience shortness of breath and weakness in her body.  Ms. Q. has been told

---

[3]  Amanda Holpuch, *'Most Cruel of Cruelties': Father and Son Separated Under Trump Policy to Be Reunited*, The Guardian (Oct. 15, 2018), https://www.theguardian.com/us-news/2018/oct/15/judge-orders-reunification-father-and-son-separated-under-trump-policy.

her symptoms are the result of anxiety attacks, which were triggered by the ongoing psychological and emotional distress caused by her sustained separation from J., and the worsening deleterious effects the separation is having on J. Ms. Q.'s fear is that J. will no longer remember his mother— or worse yet, believe that she abandoned him—and that her attachment to her son will be forever broken. Defendants have knowingly imposed a condition of severe mental pain and suffering that meets the statutory and international law definitions of torture—that will have lasting psychological impacts on both Ms. Q. and J.

9.      Beyond imposing sustained, unimaginable and unnecessary cruelty, anguish, and torture on Ms. Q. and J., the forced separation of this mother and child is unlawful. The Substantive Due Process clause guarantees this mother and child the right to familial integrity that trumps the Defendants' vague, unsubstantiated, and arbitrary bases for separating them and compels an order reuniting them, if even in family detention facility, while Procedural Due Process requires a meaningful opportunity to contest the basis for government's imposition of such a severe liberty deprivation.

10.     Defendants cannot lawfully inflict such serious, gratuitous cruelty on a parent and young child to advance narrow policy goals. Plaintiffs are suffering unbearable and irreparable harm from the trauma of this family separation practice. This Court's immediate intervention is necessary to ensure Defendants comply with law and to prevent continuing irreparable harm to Plaintiffs.

## JURISDICTION AND VENUE

11.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and the laws of the United States, including the Immigration and Nationality Act and the Administrative Procedure Act (APA), which expressly creates a right of action and waives the government's sovereign immunity. *See* 5 U.S.C. §§ 702, 706.

12.     The Court has the authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and Federal Rule of Civil Procedure 47.

13.     This Court also has authority to grant injunctive relief in this action pursuant to 5 U.S.C. §§ 702 and 706 and Federal Rule of Civil Procedure 65.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more Defendants reside within this District.  Additionally, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this District, including Defendants' decision to implement the policies at issue in this action, as well as, upon information and belief, Defendants' forming of their decision that ultimately led to the separation of Ms. Q. from J.

## PARTIES

15.     Ms. Q. is a native and citizen of El Salvador.  She entered the United States on March 22, 2018, with her (then) three-year-old son, J., to seek protection from persecution they suffered in El Salvador.  She is currently detained at the Webb County Detention Center in Laredo, Texas, where she was recently transferred after have having been at the Laredo Processing Center since on or about March 25, 2018.

16.     J. is a native and citizen of El Salvador who is now four years old.  J. is currently held at an Office of Refugee Resettlement shelter in Chicago, Illinois, where he has been held since late March 2018.

17.     Defendant U.S. Immigration and Customs Enforcement (ICE) is a component of the Department of Homeland Security (DHS), headquartered in Washington, DC, and is the federal agency responsible for carrying out removal orders and overseeing the policies and practices of detaining non-citizens in the United States.

18.     Defendant Ronald D. Vitiello is sued in his official capacity as Acting Director and Deputy Director of ICE.  In his official capacity, Defendant Vitiello is responsible for the ICE policies regarding the detention of non-citizens in the United States.

19.     Defendant DHS is a Department of the Executive Branch of the United States government, headquartered in Washington, DC, and is the federal agency responsible for enforcing the immigration laws of the United States.

20.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of DHS. In her capacity, Defendant Nielsen directs the component agencies of the DHS, including CBP and ICE.  She is responsible for the administration of the government's immigration laws and policies regarding enforcement and detention, including the laws and policies regarding the Administration's "Zero Tolerance" policy and the separation of families.

21.     Defendant Jefferson B. Sessions III is sued in his official capacity as the Attorney General of the United States.  In his capacity, Defendant Sessions is responsible for administering U.S. immigration laws pursuant to 8 U.S.C. § 1103 and has the authority to grant non-citizens asylum and other relief.

## FACTUAL BACKGROUND

**A.     Ms. Q. and J.'s Life in El Salvador**

22.     Mother and son, Ms. Q. and J., are natives of El Salvador.  They entered the United States on March 22, 2018, to seek asylum in the United States.  Their claims for protection in the United States stem from gender violence and gang-related threats and violence that Ms. Q. experienced in her home country.

23.     As a single parent, Ms. Q. has raised J. since birth on her own, providing for all of his physical and emotional needs.  Ms. Q. is the only parent that J. has ever known, and he completely relies on her in every aspect of his life.

24.     In about spring of 2016, Ms. Q. began renting a room in a house in a small municipality in El Salvador for herself and her son.  The owner of the house lived in it along with her children, sister, and a couple of distant relatives.  Ms. Q. did not know the other occupants of the house very well, and she tended to keep to herself.  Ms. Q. never saw or suspected any gang activity was taking place in the house.

25.     In about July 2016, Ms. Q. was at home with her son when she heard commotion outside the house.  People were running near the house while she heard the sounds of cars and police officers outside.  Ms. Q. took J. in her arms and stayed in her room.

26.    The police officers came into the house, guns drawn, and began searching through the house.  They yelled at her, telling her to go outside, and kept the guns pointed at her and her son.  They accused Ms. Q. of being in a gang and asked her if she knew where the gang members were.  Ms. Q. told them that she has never been a member of a gang, and she denied any involvement or affiliation with a gang.  The police recorded her statement, saved a copy of her state ID, and photographed her.  They did not arrest her, nor did they give her any papers or an explanation of what was happening.

27.    Later that same month, Ms. Q. was attacked by a group of gang members who physically beat her.  They hit her in the face and she fell to her hands.  They took her hands behind her back and continued to beat her.  Ms. Q. believes she was beaten by the gang members because they were aware that she had spoken to the police at the house that had been raided.

28.    As a result of the beating, Ms. Q.'s face turned purple and blood came out of her nose, mouth, and one of her eyes.  She had trouble seeing out of that eye for a long time and feared she was going blind.

29.    After the attack, Ms. Q. was afraid for her life and wanted to keep J. safe.  Thus, she moved around the country to live with friends and eventually moved in with her mother in San Salvador.  Finally, Ms. Q. decided that she and her son would not be safe in San Salvador or anywhere else in El Salvador, and fled with J. to the United States for her family's safety.

**B.     Ms. Q. and J.'s Immigration to the United States**

30.    Ms. Q. and J. crossed the U.S. border on March 22, 2018.  Shortly after crossing, they encountered CBP officers.  The officers told Ms. Q. and the others she was travelling with that they could turn themselves in, which Ms. Q. did.  The officers sat the group down on the street and asked about their documents and took their phones.  They also confiscated J.'s hat, causing him to cry.  The officers put Ms. Q. and J. on a bus, which took them to a processing station, known colloquially as the "*hielera*," or "ice box."

31.     J. was asleep in Ms. Q.'s arms when they arrived at the ice box.  The officers told Ms. Q. to put him down on the ground, even though the ground was hard.  The officers became upset because they wanted Ms. Q. to stand J. up, but J. cried since he did not want to stand up.

32.     Afterwards, the officers took Ms. Q. and J. to a small cell, which was crowded with other parents and their children.  Ms. Q. had difficulty finding a place to sleep, as there were no mattresses or pillows—only aluminum blankets.  She wrapped J. in one of the aluminum blankets and found a spot to lay him down next to a toilet.

33.     The next day, the officers moved Ms. Q. and J. to a dog kennel-like cage in the same building.  In the new cage, J. began to vomit and came down with diarrhea.  The vomit soiled his clothing and Ms. Q. asked for a change of clothes, but the officers would not give her any, even though Ms. Q. could see that they had extra clothes available.  When Ms. Q. took off J.'s vomit-stained clothes, the officers said J. could not be naked, but they still refused to provide any clean clothing for him.  Ms. Q. was forced to put J. in a diaper (even though he was toilet trained) so he would at least have something clean to wear.

34.     Because of his vomiting and diarrhea, Ms. Q. told the officers J. was sick, but they would not give him any medical attention.

35.     Later that same night, CBP officers showed Ms. Q. a set of documents and told her to sign it.  The paper was in English and no Spanish translation was provided.  Because she could not read English, Ms. Q. asked the officers what the document said.  They refused to explain it to her.  Instead, they insisted that she sign it.  When Ms. Q. again questioned the content of the document, the officers became angry with her.  They told Ms. Q. that they were going to take her son away because she has a "record" in her country, but did not otherwise provide details about her supposed "record," which, at the time, Ms. Q. knew nothing about.

36.     When Ms. Q. said she would not sign the documents, the officers told her that the documents were her deportation papers and that she had to sign them.  They again told Ms. Q. that they were going to take her son away if she did not sign.  At this point, Ms. Q. expressed a fear that the gangs in El Salvador would kill her if she was forced to return to El Salvador.

37.     The officers came back later that night and asked Ms. Q. for J.'s birth certificate, which Ms. Q provided.  The birth certificate lists Ms. Q. as J.'s mother.

38.     The next morning, the officers asked that Ms. Q. and J. come together to see the officers.  One of the officers told Ms. Q. to give J. to a woman who appeared to be a government employee.  Ms. Q. pleaded with them not to take J., asking where they would take him.  The officers said, "don't force us to take him."  J. was sleeping in her arms.  Ms. Q. hugged J. tightly but they seized him from her arms.  The officers then put J. on the ground and forced him to stand up.  He woke up and said "mama," as the officers took him away from her.

39.     Soon after, Ms. Q. was lined up with other immigrants in order to be transported to the Laredo Processing Center.  On her way out, Ms. Q. saw J. sitting alone in a cage.  He was looking around, as if trying to find her.  Ms. Q. tried to hide herself so that J. would not be frightened by seeing the officers take her away.  This was the last time Ms. Q. saw her son.

40.     It would be another four days before the officers gave Ms. Q any more information about J. or his well-being after they were separated.   Immigration officers questioned Ms. Q. about whether she was in a gang.  She explained that she has never been involved or affiliated with a gang.  She asked what happened to J.  The officers told her that he was taken to Chicago, Illinois, but provided no further details.

41.     The next day, an asylum officer interviewed Ms. Q. to determine if she had a "credible fear of persecution" if she was to return to El Salvador.  The asylum officer found that Ms. Q. had a credible fear of persecution in El Salvador.

42.     It was four weeks after Ms. Q. arrived at the Laredo Processing Center that she was finally given the opportunity to speak with J. on the phone.  The first conversation lasted about ten minutes.  J. said "mama," but could not say much beyond that.  J.'s caseworker told Ms. Q. not to cry because it would upset J., so Ms. Q. sang a song with J. and told him she loved him and would see him soon.

43.     After that first call, another month passed before Defendants provided Ms. Q. with another free phone call to her son.  Ms. Q. has been forced to arrange additional phone calls with J. through her attorney, using her own commissary funds.

**C.     There Is No Justification for the Defendants' Separation of Ms. Q. from J.**

44.     Defendants forcibly separated Ms. Q. from J. in late March 2018 in connection with what the Trump Administration would later publicly announce as its "Zero Tolerance" policy to prosecute all who enter the country unlawfully, and thereby to separate parents from their children.[4]  While this "Zero Tolerance" policy was finally announced in early April 2018, in fact widespread family separation already had been occurring from as early as October 2017.  Upon its announcement on April 6, 2018, Defendants had already separated approximately 700 children from their parents—including children like   J.—at the border.[5]  Defendant Attorney General Sessions would later publicly proclaim that this policy was intended to "send a message to the world" and discourage asylum seekers from "stamped[ing]" the borders.

45.     Defendants' practice of forcibly separating parents from their minor children has been widely lambasted.  There is no question that Defendants' policy is "designed to impose severe mental suffering . . . on families for coercive purposes."[6]

46.     Indeed, one federal court recently explained that Defendants' "use of the children as tools in the parents' . . . immigration proceedings" is a "brutal" and "offensive" practice that is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Ms. L.*, 310 F. Supp. 3d at 1145–46.  In that case, the court certified a class of migrant parents who had been separated from their minor children by the Defendants, and the judge in that case entered

---

[4]  J. Sessions, Memorandum from the Attorney General to Federal Prosecutors Along the Southwest Border, Office of the Attorney General (Apr. 6, 2018), https://www.justice.gov/opa/press-release/file/1049751/download.

[5]  Caitlin Dickerson, *Hundreds of Immigrant Children Have Been Taken from Parents at U.S. Border*, N.Y. Times (Apr. 20, 2018), https://www.nytimes.com/2018/04/20/us/immigrant-children-separation-ice.html.

[6]  *USA: Policy of Separating Children from Parents Is Nothing Short of Torture*, Amnesty Int'l (June 18, 2016, 5:53 PM), https://www.amnesty.org/en/latest/news/2018/06/usa-family-separation-torture/.

a preliminary injunction requiring Defendants to "reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days." *Id.* at 1149.

47.    Despite the court's finding that Defendants' "Zero Tolerance" and family separation policy was "brutal," "offensive," and "shocks the contemporary conscience," Defendants have refused to reunify Ms. Q. with J., arguing that an unsubstantiated arrest warrant from El Salvador precluded her inclusion in the *Ms. L.* class, but that she could "file an individual action seeking reunification." The *Ms. L.* court found that Ms. Q. was not part of the *Ms. L.* class, without prejudice to her ability to bring an individual claim such as the present one.

48.    Ms. Q. was not aware of the existence of this alleged arrest warrant until the *Ms. L.* litigation. Ms. Q.'s counsel submitted numerous requests to Defendants to provide a copy of the arrest warrant, and Defendants finally produced a copy on July 20, 2018, which was just days before Ms. Q.'s previously scheduled bond hearing.

49.    The Salvadoran arrest warrant contains nothing more than vague allegations regarding supposed gang affiliation—but importantly, does not reflect *any* showing of probable cause or evidentiary support for these allegations. The warrant—consistent with Salvadoran police practices indiscriminate anti-gang operations that ensnare innocent civilians—was issued after a raid relating to suspected gang activity. In July 2016, the police conducted a raid near where Ms. Q. was renting a room. Approximately 30 individuals were similarly summoned to appear in court after the raid.

50.    Ms. Q. had already fled her home and was being detained in the United States when the preliminary hearing was held in her case in June 2018, so she was never given the opportunity to meaningfully challenge the charge. Ms. Q. subsequently retained Salvadoran counsel, who determined that of the ten individuals summoned to a preliminary hearing on the charge, all six who appeared with private counsel were released immediately after the hearing and had the charges against them suspended, due to the prosecution's failure to meet its evidentiary burden. The remaining four defendants, including Ms. Q., were not present in court, so their cases remain pending their appearance at a preliminary hearing. Given the total lack of evidence against Ms. Q. in the record in El Salvador, her Salvadoran counsel awaits the scheduling of a hearing where

he can argue the prosecutor has failed to present sufficient evidence and the charge against Ms. Q. should be dropped. Because the warrant remains outstanding only because Ms. Q. did not have an opportunity to challenge the prosecutor's charge or present a defense, it falls well short of any reasonable notion of due process and cannot support Defendants' position that Ms. Q. is a gang member or otherwise a danger to J. or others.

51.     Moreover, Defendants have yet to provide any substantiation regarding which organization Ms. Q. is alleged to be a member of, what crimes she is accused of trying to commit, or even a whiff of any actual evidence or probable cause relating to any underlying crime in El Salvador.

52.     Additionally, notwithstanding the warrant, Defendants have never stated that Ms. Q. is an unfit parent, or that the warrant bears upon her ability to care for J., or will put him at risk for harm.  Nor have Defendants specifically alleged that she would harm others in detention.

53.     On July 31, 2018, an immigration judge in Laredo, Texas, held a bond hearing for Ms. Q., in which he denied bond for flight risk concerns.  However, after reviewing the arrest warrant and hearing argument from Ms. Q.'s counsel and the government, the immigration judge stated at the conclusion of the hearing that none of the evidence in the record indicated that Ms. Q. would pose a threat to national security or a danger to the community.  Indeed, he stated in a written order:

> The Court has considered the evidence [Ms. Q.] presented in favor of her release on bond and weighed the positive and negative factors in her case.  The Court finds that [Ms. Q.] is not a danger to the community.  While the record reflects that, in 2017, there was a warrant issued for [Ms. Q.]'s arrest in El Salvador charging her with "terrorist organizations," *the Court is not convinced that there is sufficient evidence to find [Ms. Q.] is a danger to the community*. . . . Aside from the aforementioned arrest warrant, [Ms. Q.] does not appear to have any other criminal history in El Salvador or the United States.  *None of the evidence in the record indicates that [Ms. Q.] would pose a threat to national security or a danger to the community at large*.  (emphasis added).

54.     Furthermore, at Ms. Q.'s asylum hearing on October 16, 2018, the government cross-examined Ms. Q. extensively about her alleged gang connections, but she provided credible testimony that she has never been affiliated with a gang.  Nor did the government present any

evidence suggesting that Ms. Q. was gang affiliated or otherwise assert that Ms. Q. is subject to any of the bars that prevent one from receiving asylum, including the bars that are triggered by criminal behavior.  Ms. Q. testified extensively at the hearing that she is not a gang member and that has not engaged in criminal behavior of any kind.  The immigration judge explicitly found her testimony credible, though he denied relief on other legal grounds in a decision that is being appealed.

55.     Despite an immigration judge's numerous findings that Ms. Q. was not a danger to the community nor ever been convicted of a crime, Defendants have nonetheless continued to maintain that Ms. Q. should not be reunified with J.  Instead, Defendants have continued to rely on a baseless and unsupported outstanding warrant in El Salvador as its basis to separate Ms. Q. from J., even though an immigration judge has examined that very document and concluded on two occasions that Ms. Q. did not pose a danger.

56.     Indeed, for the seven months that Ms. Q. has been detained, she has never caused trouble or violence at the detention center, or otherwise put those around her in any type of danger.

57.     For families like Ms. Q. and J., where the parents are not members of the *Ms. L.* class, Defendants have not disclosed any process to reunify those separated families, or otherwise provide them with a means to challenge their continued separation during the pendency of their asylum and withholding of removal claims—which may take months, if not years.

## D.     The Forcible Separation of Ms. Q. from Her Son, J., Inflicts Significant Physical and Psychological Trauma

58.     The effects of the unjustified separation on both Ms. Q. and J. are profound. Medical and mental health professionals from across the country have recognized that separating children from their parents is likely to lead to long term and irreversible psychological, developmental, and physiological harms.  As the American Academy of Pediatrics has explained, forced separation of children from their parents "only exacerbates children's suffering" and leads to serious, lifelong consequences on children's development and wellbeing: "Fear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsive relationships . . . can harm the developing brain and harm short- and long-term

health."[7]   Similarly, it has been reported that children "internalize[] the separation as a punishment," and that "[d]ecades of research have concluded that children traumatically separated from their parents have a high likelihood of developing emotional problems, cognitive delays and long-term trauma."[8]

59.     J. has already begun to suffer severe and irreparable harm.  Once toilet trained, he has reverted back to diapers after repeated bathroom-related accidents as a result of the ongoing psychological trauma of being separated from his mother.  He is also suffering from developmental delays, including difficulty in speech along with constant crying.  His caseworkers now speculate that he may be suffering from an intellectual disability.  On recent calls with Ms. Q., J. has been confused and angry, and has not recognized his mother's voice.  A federally appointed child advocate from the University of Chicago's Young Center for Immigrant Children's Rights has recommended that it is in J.'s best interest to be reunified with his mother.

60.     If J. is not reunited with his mother, the trauma he has endured is likely to cause long-lasting and permanent harm on his physical and cognitive development, leading to lifelong consequences from which he will never be able to recover.

61.     The forcible separation has also wreaked havoc on Ms. Q.'s wellbeing, as she is suffering from extreme physical and emotional distress due to the separation.  Ms. Q. has had significant trouble sleeping and cannot stop thinking about her son.  In September 2018, Ms. Q. got sick; her blood pressure rose, her lips got swollen, and she was trembling.  When she was examined at the clinic, the medical staff told Ms. Q. she was experiencing symptoms of anxiety attacks.

62.     More recently, Ms. Q. has been experiencing severe anxiety attacks—including shortness of breath, trembling, and swelling—which are manifestations of the psychological and emotional stress she has been experiencing because of her overwhelming concern for J., who she

---

[7]   Letter from Colleen A. Kraft, President, American Academy of Pediatrics, to the Hon. Kirstjen M. Nielsen, Secretary, U.S. Department of Homeland Security (Mar. 1, 2018), https://downloads.aap.org/DOFA/AAP%20Letter%20to%20DHS%20Secretary%2003-01-18.pdf.

[8]   Miriam Jordan, *A Migrant Boy Rejoins His Mother, But He's Not the Same*, N.Y. Times (July 31, 2018), https://www.nytimes.com/2018/07/31/us/migrant-children-separation-anxiety.html.

has not seen for seven months.  Ms. Q. is concerned that the longer she remains in detention and separated from J., the more her psychological and physical condition will deteriorate.

63.     On October 16, 2018, an immigration judge in Laredo, Texas, denied Ms. Q.'s request for asylum and other immigration relief on legal grounds unrelated to gang affiliation or criminal history.  Ms. Q. filed a notice of appeal on October 18, 2018, and will therefore face several more months of detention while she appeals the immigration judge's erroneous order.

64.     To this day, Ms. Q. remains detained at Webb County Detention Center in Laredo, Texas.   J. remains at an Office of Refugee Resettlement shelter for unaccompanied children in Chicago, Illinois.

## EXHAUSTION OF REMEDIES

65.     There is no exhaustion requirement because no administrative agency exists to adjudicate Plaintiffs' constitutional challenges.  *Howell v. INS*, 72 F.3d 288, 291 (2d Cir. 1995); *Arango-Aradondo v. INS*, 13 F.3d 610, 614 (2d Cir. 1994).  Neither an immigration judge nor the Board of Immigration Appeals can rule on Plaintiffs' constitutional claims.  *See Matter of C--*, 20 I&N Dec. 529, 532 (BIA 1992) ("[I]t is settled that the immigration judge and this Board lack jurisdiction to rule upon the constitutionality of the Act and the regulations." (citing *Bagues-Valles v. INS*, 779 F.2d 483, 484 (9th Cir. 1985)).

## CAUSES OF ACTION

### COUNT I:
### (Violation of Substantive Due Process)
### Defendants' Forced Separation of Ms. Q. from J. Violates Plaintiffs'
### Substantive Due Process Right to Family Integrity

66.     All preceding paragraphs are incorporated here.

67.     The Due Process Clause of the Fifth Amendment applies to all persons on United States soil, and thus applies to Ms. Q. and J.

68.     Ms. Q. and J. have a constitutional fundamental right to family integrity under the substantive component of the Due Process Clause of the Fifth Amendment.  *Jacinto-Castanon de Nolasco v. ICE*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018) (acknowledging parents' "fundamental liberty interest in family integrity, and in the care, custody, and control of their children"); *M.G.U.*

*v. Nielsen*, No. 18-1458-PLF, 2018 WL 3474189, at *6 (D.D.C. July 18, 2018) (same); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000) (parents' rights "in the care, custody, and control of their children" are "the oldest of the fundamental liberty interests recognized by this Court."); *Ms. L.*, 302 F. Supp. 3d at 1161 ("[I]t has long been settled that the liberty interest identified in the Fifth Amendment provides a right to family integrity or to familial association.").

69.     Defendants' continued forced separation of Ms. Q. from J. violates their constitutional right to family integrity.  Defendants' separation of Ms. Q. from J. does not advance any legitimate purpose, let alone any compelling governmental interest that justifies the violation of Plaintiffs' substantive due process right to family integrity.

70.     In particular, Defendants' act of separating Ms. Q. from J. for seven months— including to this day—shocks the conscience, especially where an immigration judge has found Ms. Q. is not a danger and where Ms. Q. has never been convicted of any crime and has exhibited no signs she would  pose a danger to the community or J.

71.     Ms. Q. and J. have no other adequate remedy at law.  Defendants have provided no other avenue to challenge their actions.

72.     Ms. Q. and J. are suffering irreparable harm with each day they are separated from one another.

### <u>COUNT II:</u>
### (Violation of Substantive Due Process)
### Defendants' Forced Separation of Ms. Q. from J. Violates Plaintiffs'
### Substantive Due Process Right to Be Free from Torture and/or Cruel, Inhuman, and
### Degrading Treatment

73.     All preceding paragraphs are incorporated here.

74.     Ms. Q. and J. have a substantive due process right to be free from torture and/or other cruel, inhumane, and degrading treatment.  *See Palko v. Connecticut*, 302 U.S. 319, 326 (1937) (noting that the Due Process Clause must at least "give protection against torture, physical or mental"), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) ("[C]onduct that shocks the conscience or

afford[s] brutality the cloak of law . . . violates the [Due Process Clause]." (internal quotations omitted)).

75.     Defendants' act of separating Ms. Q. from J. for seven months—including to this day—meets the definition of torture and otherwise constitutes cruel, inhuman, and degrading treatment. *See* 18 U.S.C. § 2340(1) ("'[T]orture' means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering . . . upon another person within his custody or physical control."); 18 U.S.C. § 2441(d)(1)(A) (War Crimes Act defining torture to include "act[s] specifically intended to inflict severe physical or mental pain or suffering . . . for the purpose of . . . punishment, intimidation, coercion, or any reason based on discrimination of any kind"); Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, ¶ 1 (Dec. 10, 1984), 1465 U.N.T.S. 85 (defining torture as including causing "severe pain or suffering, whether physical or mental," without the requirement to show prolonged mental harm).

76.     Furthermore, Defendants have separated Ms. Q. from J. as part of a family separation policy that is intended to advance Defendants' political goals of coercing and deterring asylum seekers from entering the United States.  To separate a mother from her three-year-old child (now four years old), thereby inflicting severe mental pain and suffering on both mother and child, for coercive and political purposes is torture and cruel, inhuman, and degrading treatment.

77.     Ms. Q. and J. have no other adequate remedy at law.  Defendants have provided no other avenue to challenge their actions.

78.     Ms. Q. and J. are suffering irreparable harm with each day they are separated from one another.

<u>**COUNT III:**</u>
**(Violation of Procedural Due Process)**
**Defendants' Forcible Separation of Ms. Q. from J. Without Notice or**
**Opportunity to Be Heard Violates Plaintiffs' Procedural Due Process Rights**

79.     All preceding paragraphs are incorporated here.

80.     Ms. Q. and J. have a right to procedural due process under the Due Process Clause of the Fifth Amendment.

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - PAGE 18**

81.     Defendants' forced separation of Ms. Q. from J. without notice or an opportunity to be heard violates their constitutional right to procedural due process.

82.     Under *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976), the Supreme Court requires a court to weigh the individual's interest, the risk of erroneous deprivation of that interest, and the government's interest.

83.     Ms. Q.'s interest in being reunified with J. after seven months of separation is profound and substantial.

84.     There is a significant risk of erroneous deprivation, as evidenced by the immigration judge's finding that Ms. Q. is not a danger.  Absent a finding that Ms. Q. poses a risk of danger to J. or the community at large, Defendants have no basis to refuse to reunify Ms. Q. with her son.  Because an immigration judge has already found that she is not a danger to the community and Defendants do not assert that Ms. Q. is an unfit parent, there is a high probability of erroneous deprivation of her parental rights.

85.     Ms. Q. and J's significant individual interest and the risk of erroneous deprivation decisively outweigh any minimal burden on Defendants in providing procedural safeguards for Ms. Q. and J. to test the legal sufficiency for Defendants' decision to separate their family.

86.     Accordingly, Ms. Q. and J. seek procedural protections under the Fifth Amendment in the form of this Court's review of Defendants' decision to forcibly separate their family.  Given the gravity of Ms. Q.'s interests in the care and custody of J., and J.'s interest in being reunited with his mother, and the risk of erroneous deprivation, this is an appropriate procedural protection.

87.     Ms. Q. and J. have no other adequate remedy at law.  Defendants have provided no other avenue to challenge their actions.

88.     Ms. Q. and J. are suffering irreparable harm with each day they are separated from each other.

**<u>COUNT IV:</u>**
**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2))**
**The Government's Decision to Refuse to Reunite Ms. Q. with J. Based Solely on an**
**Uncorroborated Foreign Warrant Is Arbitrary, Capricious, and Unsupported by the**
**Record**

89.     All preceding paragraphs are incorporated here.

90.     Defendants' decision to separate Ms. Q. and J., and their determination that Ms. Q. and J. should not be reunited, is arbitrary, capricious, and an abuse of discretion in violation of 5 U.S.C. § 706(2).

91.     Ms. Q. has never been convicted of any crime.  The only basis for Defendants' proffered justification for denying reunification—a vague and unsubstantiated foreign arrest warrant—is factually dubious and legally untested.

92.     On July 31, 2018, an immigration judge, upon reviewing the arrest warrant and evidence, determined that Ms. Q. is not a danger to the community or national security threat. Similarly, at Ms. Q.'s asylum hearing on October 16, 2018, the immigration judge found that she credibly testified that she is not in any way associated with a gang, and that none of the criminal or national security bars to asylum apply.

93.     Defendants have not alleged that Ms. Q. is otherwise unfit, a danger to J., or infected by a communicable disease that would preclude reunification.

94.     Defendants' refusal to reunite Ms. Q. with J. is a final agency action that marks the consummation of the agency's decision-making.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

95.     Ms. Q. has no other adequate remedy at law.  *See Sackett v. E.P.A.*, 566 U.S. 120, 131 (2012).  There is no statutory or administrative procedure to challenge Defendants' decision and, indeed, when Ms. Q. availed herself of a bond hearing, the immigration judge explicitly found she is not a danger.

96.     Ms. Q. and J. are suffering irreparable harm with each day they are separated from one another.

97.     This Court should assume jurisdiction over this matter, vacate Defendants' determination that Ms. Q. should not be reunified with J., and order reunification of their family unit.

## PRAYER FOR RELIEF

Plaintiffs Ms. Q. and J. respectfully request that the Court award the following relief:

A.      Issue a Preliminary Injunction ordering the immediate reunification of Ms. Q. with J.;

B.      Declare that the separation of Ms. Q. from J. is unlawful;

C.      Preliminarily and permanently enjoin Defendants from continuing to separate Ms. Q. from J.;

D.      Preliminarily and permanently enjoin Defendants from removing Ms. Q. or J. from the United States until they are reunited and each have had a full and fair opportunity to pursue their asylum, withholding, or CAT applications or other immigration proceedings, including appeals;

E.      In the event that Ms. Q. is not permitted to remain in the United States, enjoin Defendants from separating Ms. Q. and J. absent her permission;

F.      Require Defendants to pay reasonable attorney's fees and costs; and

G.      Order any other relief that the Court deems just, equitable, and proper.

///

DATE:  October 24, 2018

Respectfully submitted,

Lissa M. Percopo, D.C. Bar No. 985736
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone:     (202) 955.8500
Facsimile:     (202) 530.9694
lpercopo@gibsondunn.com

Katherine V.A. Smith*
Michael J. Galas*
Abiel Garcia*
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
Telephone:     (213) 229.7000
Facsimile:     (213) 229.7520
ksmith@gibsondunn.com
mgalas@gibsondunn.com
agarcia@gibsondunn.com

Wesley Sze*
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304
Telephone:     (650) 849.5300
Facsimile:     (650) 849.5333
wsze@gibsondunn.com

Katherine Melloy Goettel*
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle St., Ste. 1300
Chicago, IL  60604
Telephone:     (312) 660.1335
Facsimile:     (312) 660.1505
kgoettel@heartlandalliance.org

Baher Azmy*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Telephone:     (212) 614.6464
Facsimile:     (212) 614.6499
bazmy@ccrjustice.org

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF - PAGE 22**

J. Wells Dixon*
Ghita Schwarz*
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, NY  10012
Telephone:      (212) 614.6464
Facsimile:      (212) 614.6499
wdixon@ccrjustice.org
gschwarz@ccrjustice.org

*Counsel for Plaintiffs*
Ms. Q. and J.


*\* Indigent client certification forthcoming per Local
Rule 83.2(g)*